**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| In re NETFLIX, INC., SECURITIES LITIGATION | ) Case No. 12-00225 SC<br>)<br>) ORDER GRANTING MOTION TO<br>) <u>DISMISS</u><br>) |

## I.   **INTRODUCTION**

Plaintiffs Arkansas Teacher Retirement System and State-Boston Retirement System ("Plaintiffs") bring this putative securities class action against Netflix, Inc. ("Netflix"); Netflix Co-Founder, Chairman of the Board, and CEO Reed Hastings ("Hastings"); current Netflix CFO David Wells ("Wells"); and Barry McCarthy ("McCarthy"), Netflix's CFO until December 10, 2010 (collectively "Defendants").

Now before the Court is Defendants' Motion to Dismiss Plaintiffs' First Amended Consolidated Class Action Complaint.  ECF Nos. 105 ("FAC"), 108 ("Mot").  The motion is fully briefed,  ECF Nos. 110 ("Opp'n"), 111 ("Reply"), and is suitable for determination without oral argument, Civ. L.R. 7-1(b).  For the reasons set forth below, the Court GRANTS Defendants' Motion to Dismiss and DISMISSES the CCAC with prejudice.

///

///

II.    **BACKGROUND**

    A.    **Factual Overview**

     Netflix is a public corporation that purports to be the leading Internet subscription service for viewing movies and television shows (collectively "movies").  FAC ¶ 3.  Netflix currently allows consumers to watch movies either by streaming them over the Internet directly to their televisions, computers, or mobile devices, or by receiving DVDs sent to their homes.  Id.

     Netflix provided no streaming services -- only DVDs by mail -- from 1999 to 2007.  Id. ¶¶ 38-49.  In 2007 Netflix began to allow its subscribers to stream movies via the "hybrid plan," the only plan it offered at the time, which allowed subscribers both to stream movies and to receive DVDs.  Id. ¶ 41.

     In November 2010, as part of its plan to develop its streaming services further, Netflix decided to offer its subscribers a standalone streaming plan in addition to the hybrid plan.  Id. ¶ 57.  The hybrid plan cost $9.99 per month, and the new streaming-only plan cost $7.99 per month.  Id.  Shortly before this change, in October 2010, Defendants explained that the expansion of Netflix's streaming business would depend partly on its continually adding customers who wanted streaming content.  Id. ¶¶ 51-52.  Those customers' subscription payments would fuel the acquisition of more streaming content, attracting still more streaming-focused customers.  Id.  Netflix also planned to offset some of the increasing content costs by decreasing DVD-related expenditures.  See id. ¶¶ 51-53.  Netflix's increasing focus on streaming was partly driven by its conclusion that more people were joining Netflix and subscribing to the hybrid plan to use streaming, but

1    not renting any DVDs.  Id.

2         During the Class Period, Netflix's subscriber count steadily

3    increased each quarter.  Id. ¶ 54; cf. 199-200.  Its stock price

4    followed suit, rising from a closing price of $153.15 on October

5    20, 2010 to a high of $298.73 on July 13, 2011.  Id. ¶¶ 12, 55, 64.

6    On July 12, 2011, however, Netflix announced that effective

7    September 1, 2011 for existing subscribers and immediately for new

8    ones, it would no longer offer its hybrid plan.  Id. ¶ 122.

9    Instead, it would offer separate DVD-only and streaming-only plans,

10   both for $7.99 per month.  Id.  Subscribers who previously had

11   access to both DVD and streaming services for $9.99 per month under

12   the hybrid plan would now have to pay $15.98 to subscribe to the

13   new, separate plans.  Id.  Netflix's subscribers were unhappy, and

14   Netflix experienced a net loss in customers for the first time in

15   years.  See id. ¶ 143.

16        Netflix's fortunes fell further in September 2011.  First, on

17   September 2, the cable channel Starz announced that it would not

18   renew its streaming contract with Netflix effective February 28,

19   2012.  Id. ¶ 129.

20        Second, on September 15, Netflix reported that it expected to

21   lose one million subscribers during the third quarter of 2011 --

22   the first quarter in years that would close with a net loss in

23   subscribers.  Id. ¶¶ 136, 199-200.  After the announcement,

24   Netflix's stock price dropped by $39.46 to close at $169.25.  Id.

25   ¶¶ 136-37.  Nevertheless, Netflix stood behind its decision as "the

26   right choice."  Id. ¶ 380.

27        Third, on September 19, 2011, Netflix announced that it

28   planned to spin off its DVD services into a new subsidiary called

3

United States District Court
For the Northern District of California

"Qwikster." Id. ¶ 125.  Netflix planned to continue to provide streaming services via its own subscription plans and website, separately from the Qwikster subsidiary.  Id.  Netflix's customers again recoiled from this change, and Netflix lost still more subscribers.  See id. ¶¶ 136-37; see also Def.'s RJN Ex. 3, at 15.[1] Netflix soon abandoned the Qwikster idea, but continued its planned separation of the DVD-only and streaming-only plans, thereby doing away with the hybrid plan altogether.  See FAC ¶¶ 122, 127.

Shortly thereafter, on October 24, 2011, in documents related to the fourth quarter of 2011 ("4Q11"), Netflix began to report discrete financial information for the now-entirely-separate DVD-only and streaming-only plans -- information that had previously been unavailable.  Id. ¶ 141.  In its 4Q11 reports, Netflix announced that its "contribution margin for domestic streaming [would] be low in 4Q11 at around 8% . . . due to [its] increasing content spend," whereas Netflix's DVD business had a contribution profit of 50-52%.  Id. ¶ 142.  Netflix continued to stand by its decision to offer the DVD and streaming subscription plans as separate services with separate prices, but admitted that it had made the change too quickly, compounding the problem "with [a] lack of explanation about the rising cost of the expansion of streaming

---

[1] When ruling on a motion to dismiss, a court may consider documents whose contents are incorporated by reference in a complaint or upon which a complaint necessarily relies when authenticity is not contested, and matters subject to judicial notice.  Metzler Inv. GMBH v. Corinthian Colls., Inc., 540 F.3d 1049, 1061 (9th Cir. 2008) (citing Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)).  The Court grants the parties' requests for judicial notice since the relevant documents are incorporated by reference into Plaintiffs' FAC.  ECF No. 92 ("Def.'s RJN").

**United States District Court**
For the Northern District of California

1   content, and steady DVD costs." Id. ¶ 210.  Netflix also stated

2   that more long-term members canceled their subscriptions in

3   response to the pricing changes than expected, thereby making

4   Netflix's 4Q11 profits and revenues lower than predicted, though

5   Netflix would remain profitable overall.  Id.  After this

6   announcement, Netflix's stock price fell $41.47 per share to close

7   at $77.37 per share on October 25, 2011.  Id. ¶ 211.

8        Plaintiffs, Netflix shareholders, now sue Defendants for

9   alleged violations of the federal securities laws.  Their claims

10  are all based on the theory that, between October 20, 2010 and

11  October 24, 2011 (the "Class Period"), Defendants misled investors

12  about the prospects of the new streaming-focused model, thereby

13  artificially inflating Netflix's stock price and leading to a stock

14  drop of almost 67 percent after the alleged falsity of those

15  statements was revealed.

16       Plaintiffs allege that all Defendants violated Section 10(b)

17  of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and

18  Securities Exchange Commission ("SEC") Rule 10b-5; that the

19  individual Defendants violated Section 20(a) of the Act; and that

20  Hastings violated Section 20A of the Act.  Id. ¶¶ 330-55.

21       **B.   <u>Procedural Summary</u>**

22       The previous pleading in this case, Plaintiffs' Consolidated

23  Class Action Complaint, was the subject of a motion to dismiss

24  decided on February 13, 2013.  ECF Nos. 89 ("CCAC"), 102 ("Order").

25  The CCAC asserted the same causes of action as the FAC, though

26  Plaintiffs' underlying theories then were based on their

27  allegations that Defendants made false and misleading statements

28  about: (1) Netflix's accounting practices, which Plaintiffs

asserted were in violation of Generally Accepted Accounting Principles ("GAAP") and SEC disclosure rules; (2) the virtuous cycle, which was Netflix's name for its business model of acquiring streaming content and consequently increasing and retaining streaming-focused customers; (3) streaming's profitability relative to that of the DVD business; (4) Netflix's pricing changes; and (5) disclosures to the SEC.

The Court dismissed Plaintiffs' CCAC because it found that (1) Plaintiffs' accounting arguments were not plausible; (2) Defendants' statements about the virtuous cycle were not false or misleading; (3) Defendants did not mislead their customers about streaming's profitability; (4) none of Defendants' statements about the pricing changes were false or misleading; and (5) Defendants' correspondence with the SEC was not actionable.  The Court gave Plaintiffs leave to amend their complaint to plead new facts supporting their allegation that Defendants made false or misleading statements during the Class Period.  Plaintiffs filed the FAC on March 22, 2013, and the motion at bar ensued.

## III.  **LEGAL STANDARDS**

### A.  **Motion to Dismiss**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim." Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988).  "When there are well-pleaded factual allegations, a court

should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  A court's review is generally "limited to the complaint, materials incorporated into the complaint by reference, and matters of which the court may take judicial notice."  Metzler, 540 F.3d at 1061 (citing Tellabs, 551 U.S. at 322).

**B.   Section 10(b)**

Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe . . . ."  15 U.S.C. § 78j(b).  One such rule prescribed by the Commission is Rule 10b-5, which states that "[i]t shall be unlawful for any person . . . [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(c).  Plaintiffs must plead five elements to establish a violation of Rule 10b-5: "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction

United States District Court
For the Northern District of California

and loss causation, and (5) economic loss."[2]   <u>In re Daou Sys.</u>, 411

F.3d 1006, 1014 (9th Cir. 2005).

　　　Plaintiffs must also meet the heightened pleading standards of

Federal Rule of Civil Procedure 9(b) and the Private Securities

Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4.   The

PSLRA requires plaintiffs to "specify each statement alleged to

have been misleading [and] the reason or reasons why the statement

is misleading."  15 U.S.C. § 78u-4(b)(1).   Additionally, the

complaint must "state with particularity facts giving rise to a

strong inference that the defendant acted with the required state

of mind."  <u>Id.</u> § 78u-4(b)(2).   The "required state of mind" for

establishing securities fraud is the knowing, intentional, or

deliberately reckless disclosure of false or misleading statements.

<u>See</u> <u>Daou</u>, 411 F.3d at 1014-15.   "The stricter standard for pleading

scienter naturally results in a stricter standard for pleading

falsity, because falsity and scienter in private securities fraud

cases are generally strongly inferred from the same set of facts,

and the two requirements may be combined into a unitary inquiry

under the PSLRA."  <u>Id.</u> at 1015 (internal quotation marks omitted).


**IV.   <u>DISCUSSION</u>**

　　　**A.   <u>Plaintiffs' Section 10(b) Claim</u>**

　　　Plaintiffs' theory of Defendants' liability is essentially

that Defendants knew streaming would be relatively less profitable

than DVD offerings, but decided to tell the public that Netflix's

---

[2]   The Court need not reach the issue of scienter, because the Court finds Plaintiffs' claims about false or misleading statements to be implausible.

**United States District Court**
For the Northern District of California

shift to streaming would be a good thing for the company.  <u>See</u>
Opp'n at 11-17.  Plaintiffs allege that throughout the Class
Period, Defendants sold stock at prices their own statements
artificially inflated, despite knowing that the truth would sink
the company's stock price.  <u>Id.</u>  According to Plaintiffs,
Defendants' statements and omissions led to Netflix's stock crash
after the disparate contribution margins of DVD and streaming
became public in October 2011.  <u>See</u> Opp'n at 6.

Defendants argue that they were never required to disclose any
information about streaming's profitability before they actually
did so; that they never made any affirmative statements about the
profitability of streaming; that they disclosed the risks of their
business's focus on streaming; and that Defendants had no knowledge
that contradicted what they told the public.  <u>See</u> MTD at 1-3.

The same cases the Court discussed in its previous Order,
namely <u>Matrixx Initiatives, Inc. v. Siricusano</u>, 131 S. Ct. 1309,
1321-22 (2011), and <u>Brody v. Transitional Hospitals Corp.</u>, 280 F.3d
997, 1006 (9th Cir. 2002), control here.  <u>Matrixx</u> and <u>Brody</u>
establish the rules that companies can control what they disclose
publicly, and that Section 10(b) and Rule 10b-5(b) do not create
affirmative duties to disclose "any and all material information":
they need only disclose what is necessary to render statements, in
the light of the circumstances under which they were made, not
misleading.  <u>Matrixx</u>, 131 S. Ct. at 1321-22.  This is a context-
sensitive rule, and the additional case Plaintiffs now cite, <u>Berson</u>
<u>v. Applied Signal Technology, Inc.</u>, 527 F.3d 982, 986-87 (9th Cir.
2008), did not change that.

<u>Berson</u> concerned a defendant company that had specifically

1    touted its backlog of anticipated revenues from uncompleted but

2    still-extant contracts.  See id.  The company did not disclose that

3    some of those backlogged contracts were, at the time defendant made

4    its disclosures, subject to stop-work orders that would not result

5    in any value for the company.  Id.  The truth was therefore very

6    different from what the defendant had led its investors to believe:

7    the defendant touted its backlogged contracts as a source of value,

8    when in fact those contracts were valueless.  Id.  Since the

9    defendant touted those contracts anyway, it had a duty to disclose

10   the truth about the stop-work orders even though it could have

11   avoided such a duty by refusing to mention either the backlogs or

12   the stop-work orders.  Id. at 987.

13       Berson is inapposite.  Plaintiffs' argument is essentially

14   that as soon as Netflix began to discuss its focus on streaming, it

15   had a duty to disclose all manner of information about streaming's

16   margins relative to DVD's, even if that information simply did not

17   exist.  See Opp'n at 14-15.  But this takes Berson too far.  Berson

18   concerned a discrete statement that hid the truth behind what the

19   defendants had said.  See 527 F.3d at 987.

20       In this case, as explained more fully below, Plaintiffs fail

21   to plead that Defendants made such a statement.  The closest they

22   come is to allege that Defendants discussed the risks of their

23   shift to streaming in context of many other factors, including

24   overall margins, and Berson specifically treats these kinds of

25   candid statements of risk differently from companies' boasts about

26   certainties.  527 F.3d at 987 ("[One type of statement] indicates a

27   risk, the other a certainty.  It goes without saying that investors

28   would treat the two differently.").  Moreover, Berson's rule on

10

**United States District Court**
For the Northern District of California

discrete statements does not map to a factual situation in which
plaintiffs have not shown -- as discussed below -- that defendants
possess actual knowledge that a statement was false.  Berson
accordingly does not change the general rules the Court must apply
in cases like this one.

To prove that Defendants' statements were false and
misleading, Plaintiffs have to show that Defendants both knew of
streaming's disparate profitability as compared to DVD's and had a
duty to disclose that in tandem with the public statements that
Plaintiffs cite.  See Matrixx, 131 S. Ct. at 1321.  Plaintiffs must
also plausibly allege that Defendants' statements would have been
misleading to a reasonable investor, either on their own or as a
result of an omission.  See id. at 1322-23.  The Court addresses
Plaintiffs' new pleadings first, then considers the pleadings that
are essentially unchanged from the CCAC.

All of Plaintiffs' substantive allegations of falsity are
based on their contentions that Defendants misrepresented or failed
to disclose these general facts: "(i) the shift to streaming
presented significant financial challenges to Netflix because it
was far more expensive and far less profitable than DVD; (ii)
streaming's relative profitability as compared to DVD was minimal;
[] (iii) the soaring costs of the Streaming Business were not
offset by the decreased costs of mailing in the DVD Business"; and
(iv) giving "the impression that streaming is consistent with a 30-
35% contribution margin, when, as later revealed, it was only at
8%."  FAC ¶¶ 153-56, 160-61, 164-65, 168-70, 176-79, 183-86, 188-
92.
///

1          **1.   Plaintiffs' New Allegations**

2      As noted above, Plaintiffs' FAC is almost the same as their

3  CCAC.  Plaintiffs cite three new statements from Defendants or

4  their agents, and expand on several more statements.  All of these

5  statements concern Defendants' alleged knowledge of the truth about

6  Netflix's streaming component's profitability and effect on

7  Netflix's margins.  Plaintiffs also add a new Confidential Witness,

8  "CW3," who discusses the same matter.

9      June 2, 2011 Statement: Plaintiffs quote part of a Nomura

10 Securities US Media Summit Call, on which Netflix was allegedly

11 represented by non-defendant Ted Sarandos.  FAC ¶ 185.  Mr.

12 Sarandos answered an analyst's questions about what has changed to

13 increase Netflix's flow of content, what the biggest changes in

14 physical rental were, and what the biggest changes or drop-offs in

15 terms of usage were.  Id.  Mr. Sarandos said that (1) Hollywood did

16 not run its business with Netflix's mentality, which is "willing to

17 kill our existing business to move on to the next one"; (2) people

18 were mostly joining Netflix for streaming, so Netflix had been

19 focusing on streaming while DVD ran "calmly on its own"; and (3)

20 while DVD was still profitable and would be for a long time, "in

21 markets where the streaming business is doing really well the DVD

22 business is flattening out more."  Id.

23     The June 2, 2011 statements from Mr. Sarandos do not support

24 Plaintiffs' allegations.  Plaintiffs cited Mr. Sarandos's

25 quotations somewhat selectively to make it seem as if he was

26 actually saying that Netflix was prepared and willing to kill their

27 DVD business to move on to the next one, i.e., streaming, thereby

28 suggesting that the streaming component had completely supplanted

**United States District Court**
For the Northern District of California

the DVD component.  See Opp'n at 2, 5, 12, 14.  The Court finds
that this is not the case.  Mr. Sarandos was talking about the
philosophy of Hollywood versus Silicon Valley, characterizing the
former as a "relationship town" that focuses on preserving the
status quo and the latter as a place philosophically more prepared
to make drastic business shifts.  See FAC ¶ 185.  Moreover, all of
Defendants' other statements make clear that, while they were
planning to shift the business's focus to streaming, DVD would
remain part of Netflix's business plan.  See id. ¶ 180.  Mr.
Sarandos himself said, during the same conversation Plaintiffs
cite, "The value proposition of the DVD business is going to be
very good for a very long time."  Id. ¶ 185.  The Court finds that
these statements are not plausibly false or misleading.  They are
therefore insufficient to support Plaintiffs' claims.

July 25, 2011 Statement: Plaintiffs refer to a shareholder
letter filed on July 26, 2011, and an earnings call held on the
same day.  Id. ¶¶ 188-89.  The letter indicated that Netflix's
streaming-only plan gained in popularity during Second Quarter
2011, that DVD shipments had "likely peaked" with the "rapid
adoption of streaming," and that Defendants had "spoken frequently"
of how they were "directing savings generated from declining DVD
demand into additional streaming content and marketing."  Id. ¶
188.

Defendants Hastings and Wells said during the July 25 earnings
call that they were gaining confidence over the last two years
about "the viability and strength of a pure streaming plan,"
especially since 75 percent of subscribers had chosen streaming-
only plans even though DVD plans were only two dollars more

expensive.  Id. ¶ 189.  Defendant Hastings stated that with the

pricing change, Netflix could strengthen its streaming plan with

more content.  Id.  Defendant Hastings added that investing in its

DVD business would continue to be a smart choice, and that even if

it did not grow it would at least shrink slowly instead of rapidly.

ECF No. 112-1 ("Decl. ISO Reply") Ex. E ("July 25 Tr.") at 3.

Defendant Hastings said that Netflix would "figure out" these

growth prospects over "the next couple of quarters."  Id.  The

Court finds these statements insufficient to support Plaintiffs'

claim: they are, in context, optimistic statements about streaming

among candid statements of risk.

Plaintiffs also point to Defendant Hastings' response to an

analyst's question about how separating the DVD and streaming

components of its business would impact its content partnerships.

FAC ¶¶ 190-91; July 25 Tr. at 3.  Defendant Hastings stated that

movie studios have had different DVD and streaming divisions "for a

while," leading Defendants not to see "any significant effect

coming out of the separation of the plans."  July 25 Tr. at 3.  And

in response to separate question about whether DVD would become

more or less of a priority after being decoupled from streaming,

Defendant Hastings stated that the DVD business would be "less

important to those people at Netflix working on streaming, and much

more important to those people in the dedicated DVD division.  And

that's the purpose of putting it in a separate group, so they can

focus on that."  Id.  The Court finds that none of these statements

are false or misleading.  The questions concerned content

partnerships, not profitability or financial information.

Plaintiffs then point to Defendant Hastings' statement that,

United States District Court
For the Northern District of California

by having DVD "as a division within Netflix, [Netflix had] a way to measure the P&L [profit and loss]." Id. ¶ 191.  Plaintiffs state that this reflects Defendants' capability of measuring the P&L for Netflix's DVD component while it was part of the hybrid plan, leading Plaintiffs to conclude that Netflix "necessarily also had the capability of measuring the P&L for streaming." Id. ¶ 190. (At this point, Netflix had separate streaming and DVD plans for new users, but existing users' hybrid plans would not be phased out until September 2011.)  These statements are implausible as bases for Plaintiffs' allegations of securities fraud.  In context, it is clear that Defendant Hastings was stating that Defendants would have P&L information for the DVD component in the future -- he said nothing about the streaming component and, as noted above, did not have to, either as a matter of duty or in response to the analyst's question about Netflix's DVD-only business alone.  See July 25 Tr. at 3.; see also supra Section IV.A.1.  The Court does not find that Defendant Hastings' statement, taken alone or alongside Plaintiffs' other allegations, suggests that Defendants knew it was false or misleading, or that it rendered other statements actionable.  The Court finds that these statements are not plausible bases for Defendants' claims.

September 21, 2011 Statement: Plaintiffs add a quotation from a Goldman Sachs Communacopia Conference Call in which Netflix participated.  Id. ¶ 204.  In response to an analyst's request for a "narrative" of Netflix's focus and a query about why investors should own Netflix shares, Defendant Wells said this: "I think the core message I'll deliver is that we feel strongly that the core thesis is intact.  The size and the opportunity of the domestic and

1   the international streaming market or electronic, entertainment
2   market is intact. And we're well positioned. We're still well
3   positioned to take advantage of that and to grow into a large
4   share." Id. Defendant Wells also stated that Netflix used
5   mathematical models to predict streaming content's value in
6   negotiations. FAC ¶ 94. Finally, he added that Netflix would
7   continue to analyze the now-separate DVD division's revenue
8   streams. Id. ¶ 95.

9       Defendant Wells's September 21, 2011 statements do not provide
10  plausible support for Plaintiffs' claims. They are too vague and
11  general to plausibly show that Defendants had knowledge of the
12  disparities in DVD's and streaming's contribution margins. They
13  also do not make false or misleading representations about such
14  margins. The Court also finds that these statements do not support
15  Plaintiffs' contention that Defendants were analyzing streaming's
16  profitability.

17      Expansion of December 8, 2010 Statement: Plaintiffs expand on
18  December 8, 2010 statements referenced in the CCAC. These
19  statements were made on a Barclays Capital Global Technology
20  Conference Call. Id. ¶ 160. Plaintiffs quote sections of this
21  call rather selectively. Compare id. with ECF No. 109 ("Liss
22  Decl.") Ex. A ("Barclays Tr.") at 5. Plaintiffs characterize the
23  analyst's question as being about "the impact of streaming content
24  costs on margins." Id. But the actual question concerned studios
25  and pay-TV networks with whom Netflix was negotiating for content.
26  The analyst asked about those parties' future plans; whether, in
27  the long term, it was "the right thing" for them to license content
28  to Netflix; and "whether [doing so] potentially hurts their seat at

the table a few years down the line." <u>Id.</u>

Plaintiffs quote Defendant Hastings as responding to that question by saying:

> [T]here is no risk of a big negative thing happening to Netflix. And, in general, investors ask us questions like, well, if the cost of content is X, won't that tank your margins? And we are always surprised when we get that question because we are like no, we manage the margins . . . the margins would be preserved . . . [s]o it is not going to ever manifest itself as margin risk.

FAC ¶ 160.

However, having carefully read the transcript, the Court finds that Defendant Hastings is referring to the risk of having a majority of its streaming content tied to a single provider, which he calls a "concentration risk." Barclays Tr. at 5. Defendant Hastings states that because Netflix had "added a lot of content," even since the prior year's statement that "no content provider was more than 20% of [Netflix's] viewing." <u>Id.</u> The "big negative thing" refers to the risk of a single content provider pulling content, and Defendants' disclosure and explanation of such a risk is to be treated differently from statements about certainties. <u>See</u> <u>Berson</u>, 527 F.3d at 987.

Further, Defendant Hastings' statement that "[Netflix's] margins would be preserved" as it continued to invest in content is tucked between two ellipses in Plaintiffs' FAC, but in context on the call's full transcript, the Court finds that Defendant Hastings was referring to Netflix's management of margins in terms of its not overspending in its content purchases. This is not a statement about specific streaming margins, nor is it actionable in general.

**United States District Court**
For the Northern District of California

1   Similarly, the statement that purchasing content for streaming

2   was "not going to ever manifest itself as margin risk" comes

3   several sentences after Defendant Hastings hedges his statements on

4   the benefits of content spending and the importance of management

5   discipline.  Before he refers to "margin risk," he says that if

6   content were ever more expensive than Netflix thought, they would

7   not purchase it, a decision that could lead to Netflix's having

8   less total content, being less exciting to consumers, and resulting

9   in less growth, but preserving Netflix's margins.  Id.  The Court

10  finds that this statement, like those above, is a statement about

11  risk, not certainty -- it is not actionable.  Berson, 527 F.3d at

12  987.

13  Expansion of December 20, 2010 Statement: Plaintiffs add more

14  quotations from an article by Defendant Hastings.  In the article,

15  Defendant Hastings responded to an investment advisor's suggestion

16  that investors should short Netflix because of rising content costs

17  and a more competitive streaming landscape.  FAC ¶ 163.  Defendant

18  Hastings stated that Netflix's subscriber base was growing fast

19  enough, with DVD shipments slowing down enough, for Netflix both to

20  pay for existing streaming content and to add more content to its

21  library.  Id. ¶ 164.  He added that Netflix had "no intention of

22  overspending relative to [its] margin structure, and there is no

23  specific content that [Netflix] 'must have' at nearly any cost."

24  Id.  He concluded by saying that Netflix spends 65-70 percent of

25  revenue on Cost of Goods Sold (which is mostly content and postage)

26  in its domestic business,  and that "if content costs rose faster

27  than we expected, then in practice we'd have less content than

28  otherwise, rather than less margin.  This would ultimately show up

United States District Court
For the Northern District of California

in less subscriber growth than we wanted from a not-as-good-as-it-would-otherwise-be service; it would not likely show up as a sudden hit to margins." Id.

The Court finds that Plaintiffs' expanded discussions of Defendants' December 8 and 20, 2010, statements do not render Plaintiffs' claims plausible. Plaintiffs attempt to argue both that these statements were "specific representations concerning Netflix's streaming profit margins" and that the statements did not refer "explicitly to streaming's profitability." Opp'n at 15, 17 n.14. In context, the Court finds it clear that the statements refer to Netflix's overall margins, just as the Court found in its previous Order. See Order at 15-16. The statements issued several months before Defendants could have evaluated different components' profit margins, according to Plaintiffs' measurements. See Ex. A at 5; see also FAC ¶¶ 157, 160-62, 164-65. Moreover, Defendant Hastings' statements both make clear that Netflix planned to be cautious in its content investments, and that presenting less content to its subscribers could result in less subscriber growth. See FAC ¶¶ 160, 64. The Court finds that these statements are not plausible bases for Plaintiffs' claims.

CW3: CW3 was a Manager of Content Planning and Analysis at Netflix from June 2011 to July 2012. Id. ¶ 224. Plaintiffs state that CW3 "confirms that Netflix had the capability to: (i) track the profitability of streaming; (ii) determine a profit margin for the purposes of determining separate streaming pricing; and (iii) calculate what the streaming profit margin needed to be." Id. Plaintiffs allege that CW3 confirmed that Netflix's decision to split streaming and DVD was made before June 2011, and that

19

**United States District Court**
For the Northern District of California

1   streaming was a fixed-cost business with profit based almost

2   entirely on the fixed cost of content.  Id. ¶ 224.  Plaintiffs also

3   assert that according to CW3, Netflix was performing ROI analyses

4   to determine different streaming packages' profitability, and that

5   these analyses helped them to determine that Starz's requested

6   dollar amount for its content exceeded that content's

7   profitability.  Id. ¶ 226.

8       Plaintiffs claim that on a September 21, 2011 conference call,

9   Defendants corroborated CW3's allegations.  Id. ¶ 227.  On that

10  call, Defendant Wells stated that in negotiations for groups of

11  television or movie titles, Netflix would use hours viewed by its

12  streaming subscribers as a proxy for value, and "to the extent that

13  [Netflix uses] regression and other math valuation models" to

14  predict a group of titles' relative value, Netflix could estimate a

15  reservation price for its deals.  Id.  Plaintiffs also state that

16  during the same call, Defendants revealed that they had segmented

17  operating profits for its DVD division, pointing to another of

18  Defendant Wells' statements -- devoid of context here and not

19  explained elsewhere -- about "the long-term earnings stream from a

20  DVD division" and the notion that Netflix would continue to

21  "segment that out" while "looking at operating profit."  Id. ¶ 228.

22      The parties dispute the relevance of CW3's statements to

23  Plaintiff's theory that Defendants knew of actual profit

24  information about streaming.  Plaintiffs say that they recently

25  learned that CW3 had signed a declaration prepared by Netflix's

26  counsel, clarifying that "[t]erms like 'profitability' or 'return

27  on investment,' to the extent used by [CW3] or in [CW3's] group,

28  referred to whether the cost of content would be justified by the

**United States District Court**
For the Northern District of California

anticipated consumption (viewing hours) of that content" and did

not mean "financial profitability," i.e., revenue minus costs.

Opp'n at 1 n.2.

Plaintiffs apparently wanted to stipulate to amend their FAC

to add this clarifying statement, but the parties never agreed to

do so.  Id.  The parties engage in some footnoted back-and-forth

about the procedural aspects of this declaration at this point in

litigation, see id.; Reply at 4 n.4.  However, the important point

is that Plaintiffs concede that CW3's statements refer not to

financial profitability (revenue minus costs) but to estimates of

anticipated content consumption.  Opp'n at 1 n.1.  Thus, CW3's

statements do not indicate that Defendants had actual knowledge of

streaming's relative profitability at any point before they

actually declared it.

None of Plaintiffs' CWs, even CW3, make Plaintiffs' claims any

more plausible than they were last time.  As noted in Section II.B,

supra, Plaintiffs clarify that CW3 actually uses the word

"profitability" to mean "cost efficiency," which is not the same as

profitability.  Opp'n at 1 n.2.  Moreover, CW3's statements do not

show that Defendants hid the real state of their business affairs

from their investors.  Conclusory assertions that Defendants could

have extrapolated complicated financial data from estimated values

derived for purposes of negotiation do not render that claim any

more plausible: forecasting and estimating are not the same as

knowing the present value of an interrelated business component.

Further, the fact that Defendants later began tracking information

about DVDs still does not indicate that they knew the same

information about streaming until that product was separated from

21

Defendants' other plans.

CW1 and CW2, as discussed in the Court's previous Order, also do not support Plaintiffs' claims or render them plausible, because those CWs did not possess discrete profitability data and were not employed by Netflix at a relevant time.  Order at 16.  The Court therefore finds that Plaintiffs' CWs' statements do not plausibly support Plaintiffs' claims.

In general, all of Plaintiffs' allegations -- new and old -- depend on the tenuous theory that Defendants withheld discrete and accurate financial information about streaming while also touting streaming's profitability.  The Court has not found this to be the case for any statement Plaintiffs cite.  Plaintiffs supply an array of vague, sometimes conclusory, statements to support a theory that requires much more by virtue of its being narrow and fact-sensitive.  This is not enough to state a claim under the PSLRA.

### 1.   **Plaintiffs' Re-pled Claims**

Plaintiffs allege numerous facts that mirror what they pled about profitability in their CCAC.  As for the statements the Court addressed in its prior Order, and to the application of Plaintiffs' newly cited cases more generally, Plaintiffs have not shown that Defendants touted the independent profitability of streaming such that they would have a duty to disclose any of the negative aspects of their streaming business.  Indeed, Defendants explicitly refused to discuss the independent profitability of streaming.  See Def.'s RJN Ex. 7 ("Q3 Earnings Call") (in which Defendant Hastings says, in response to a question about what Netflix's US streaming margins would be, that Defendants did not know what the margins were or would be in the future).

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1    The Court finds that Plaintiffs' claims based on Defendants'

2  statements and other facts that Plaintiffs also pled in their CCAC

3  are implausible now for the same reasons they were when the Court

4  dismissed Plaintiffs' CCAC.  See Order at 11-18 (considering the

5  parts of Plaintiffs' CCAC that remain essentially unchanged in the

6  FAC).  The Court will not rewrite its previous Order here, so the

7  following paragraph briefly summarizes the factual problems with

8  Plaintiffs' restated pleadings.

9    Plaintiffs do not plead plausible facts indicating that

10  Defendants touted the streaming business's profitability as opposed

11  to the projected or hoped-for strength of the interrelated DVD and

12  streaming business.  Moreover, Defendants made clear throughout the

13  Class Period that the success of a streaming-focused business model

14  was contingent on other factors, primarily the growth and retention

15  of Netflix's subscriber base, suggesting that Defendants did not

16  omit any information or warnings in a way that would be misleading

17  under Rule 10b-5.  None of what Plaintiffs plead therefore shows

18  that Defendants made any false or misleading statements about the

19  profitability of the streaming business.

20    **B.   Plaintiffs' Remaining Claims**

21    Absent an underlying violation of the Exchange Act, there can

22  be no control person liability under Section 20(a).  Paracor Fin.,

23  Inc. v. Gen. Elec. Capital Corp., 96 F.3d 1151, 1161 (9th Cir.

24  1996).  Because Plaintiffs have not pled a violation of Section

25  10(b), their control person claim is also DISMISSED.  See Shurkin

26  v. Golden State Vintners, Inc., 471 F. Supp. 2d 998, 1027 (N.D.

27  Cal. 2006).  Likewise, there can be no insider trading liability

28  under Section 20A without an underlying violation of Section 10(b).

See In re VeriFone, 11 F.3d at 872.  Plaintiffs' Section 20A claim is therefore DISMISSED.

    **C.**    **Leave to Amend**

    The Court is aware that the heightened pleading standards of the PSLRA serve as a higher bar for plaintiffs in securities fraud class actions.  Granting leave to amend -- already liberally given in the Ninth Circuit -- is often viewed favorably in many PSLRA cases.  However, in this case, the Court dismisses Plaintiffs' claims based on their failure to plead false or misleading statements.  Falsity, unlike scienter, generally does not require the same depth of investigation.  In this case, Plaintiffs have had two opportunities to plead false statements, but in both cases they have failed to do so.  Therefore the Court declines to grant Plaintiffs leave to amend their FAC.

**V.**    **CONCLUSION**

    For the foregoing reasons, the Court GRANTS Defendants Reed Hastings, David Wells, Barry McCarthy, and Netflix, Inc.'s Motion to Dismiss.  Plaintiffs Arkansas Teacher Retirement System and State-Boston Retirement System's First Amended Consolidated Class Action Complaint is DISMISSED WITH PREJUDICE.


    IT IS SO ORDERED.


    Dated: August 20, 2013

_____
UNITED STATES DISTRICT JUDGE

**United States District Court**
For the Northern District of California